FILED

# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

DEC 23 2015

JULIE RICHARDS JOHNSTON, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 5:15-mj-2316-RN |
| HIKMATULLAH SHADMAN | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **January, 2009 to April, 2009** in the county of **Cumberland** in the **Eastern** District of **NC and elsewhere**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, US Code, Section 371 | Conspiracy to Commit Offenses Against the United States |
| Title 18, US Code, Section 201(c) | Giving, Offering, and Promising Gratuities to Public Officials for or Because of Any Official Act Performed or to be Performed by such Public Official |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Timothy G. Gannon/FBI

☑ Continued on the attached sheet.

_____
Complainant's signature

Timothy G. Gannon, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/23/15

_____
Judge's signature

City and state: Raleigh, NC

Robert T. Numbers, II, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# CRIMINAL COMPLAINT AND ARREST WARRANT

I, Timothy G. Gannon, being duly sworn state the following:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) assigned to the Charlotte Field Office (North Carolina) with duty in the Fayetteville Resident Agency and am your affiant herein. I have been a Special Agent with the FBI for over 25 years and have investigated a wide variety of criminal offenses, including cases involving theft of government property, money laundering, and public corruption offenses, to include bribery, kickbacks and gratuities. Over the last several years, I have been heavily involved with investigations of these types of offenses as they relate to the United States' war efforts overseas.

2. This affidavit is being submitted in support of a criminal complaint charging HIKMATULLAH SHADMAN with entering into a conspiracy to bribe public officials, in violation of Title 18, United States Code, Section 371, and with giving and offering cash gratuities to public officials for or because of any official act performed or to be performed by such public officials, in violation of Title 18, United States Code, Section 201(c)(1)(A). This affidavit is also submitted in support of an arrest warrant on these charges.

3. The statements contained in this affidavit are in part based on information provided by Special Agents and other employees of the FBI, the United States Army Criminal Investigation Command, the Defense Criminal Investigative Service, and the Special Inspector General for Afghanistan Reconstruction. Statements are also based in part on interviews, witness statements, records and documents gathered during the course of this investigation, and on my experience and background as a Special Agent of the FBI.

4. I have not included each and every fact known to me concerning this investigation; rather, I have set forth the facts that I believe are necessary to establish probable cause to support the issuance of a complaint and an arrest warrant.

5. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that HIKMATULLAH SHADMAN has committed violations of Title 18, United States Code, Sections 371, and 201(c)(1)(A), in connection with his receipt of United States subcontracts in Afghanistan.

## STATUTORY BACKGROUND

6. Title 18, United States Code, Section 371 makes it unlawful for two or more persons to "conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy... ." 18 U.S.C. § 371.

7. Title 18, United States Code, Section 201(c)(1)(A) makes it unlawful for any person to directly or indirectly give, offer, or promise anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official. 18 U.S.C. § 201(c)(1)(A).

8. Title 18, United States Code, Section 201(c)(1)(B) makes it unlawful for any person, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demand, seek, receive, accept, or agree to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person." 18 U.S.C. § 201(c)(1)(B).

2

9. The statute further defines a "public official" to include any "officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, ... in any official function, under or by authority of any such department, agency or branch of Government." 18 U.S.C. § 201(a)(1).

10. The statute further defines "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(2).

11. Venue in the Eastern District of North Carolina is established under Title 18, United States Code, Section 3238, which provides that "all offenses begun or committed... out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought... ." 18 U.S.C. § 3238.

12. Title 18, United States Code, § 3287, provides for the wartime suspension of the statute of limitations with certain offenses:

> When the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)), the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.

18 U.S.C. § 3287.

3

## FACTS IN SUPPORT OF PROBABLE CAUSE

At all times relevant to this Complaint,

### Background of the Investigation

13. The United States Government paid contractors and subcontractors through the North Atlantic Treaty Organization (NATO) to transport supplies to United States military forces operating in Afghanistan. Afghan trucking companies competed for subcontracts to fill requirements for the transport of fuel, food, water, and an assortment of other items to military units located throughout Afghanistan.

14. A NATO contract, known colloquially as the "Jingle Truck" contract, served as one contract vehicle for supply transports. The contract was administered in Afghanistan by the NATO Maintenance and Supply Agency, or NAMSA (since the time of the events alleged herein, the name of this entity has changed to the NATO Support Agency (NSPA)).

15. United States military units operating in southern Afghanistan submitted requests for resupply of fuel, equipment, food, and other items to military logistics units. One such unit was the Movement Control Team (MCT) operating at Kandahar Air Field. The MCT recorded unit requests onto Transportation Movement Request (TMR) forms. The size and number of trucks required to fulfill a particular TMR depended on the type and volume of the items requested. TMR forms were routed through the prime contractor for the Jingle Truck contract, and in turn subcontracts were awarded to Afghan trucking companies to complete the requested transports. Once a TMR was fulfilled, the MCT certified that the requesting unit had received the requested supplies, and the responsible trucking company was paid by the prime contractor, and the cost was invoiced to the United States.

16. Contracting rules required the Jingle Truck prime contractor to compete each TMR by reviewing competitive bids from a list of eligible Afghan trucking companies. However, the competitive process often was circumvented when the MCT or the requesting unit designated a specific trucking company. Rather than competing the subcontract, the prime contractor simply awarded the TMR subcontract directly to the designated company.

17. HIKMATULLAH SHADMAN (also known as Hikmat Shadman), an Afghan national, owned and operated Hikmat Shadman Logistics Services Company (HSLSC), also known as Hikmat Shadman Supply and Construction Company (HSCC).

18. TOIFOR Global Life Support Services (now doing business as Xeless) was a Hungarian company with offices at Kandahar Air Field, Afghanistan. Beginning in approximately October 2007, TOIFOR served as the prime contractor to NAMSA for the Jingle Truck contract.

19. HSCC operated as one of TOIFOR's subcontractors for TMR subcontracts awarded under the Jingle Truck prime contract.

20. Co-conspirator Staff Sergeant (now Sergeant First Class) Robert Warren Green, who, along with SHADMAN, is one of the joint offenders in the bribery scheme described herein, was a member of the United States Army, a department of the United States. As such, he was a public official within the meaning of Title 18, United States Code, Section 201(a). Green, a resident of this District, has been charged, pleaded guilty, and has been sentenced in the Eastern District of North Carolina for his conduct described in this Complaint. *See United States v. Robert Warren Green*, No. 5:15-CR-108-1BO (pled guilty to demanding, seeking, and receiving gratuities in violation of 18 U.S.C. § 201(c)(1)(B)).

5

21. Co-conspirator First Lieutenant (now Captain) David Anthony Kline, who, along with SHADMAN, is one of the joint offenders in the bribery scheme described herein, was a member of the United States Army, a department of the United States. As such, he was a public official within the meaning of Title 18, United States Code, Section 201(a). Kline has been charged and has pleaded guilty in the Eastern District of North Carolina for his conduct described in this Complaint. *See United States v. David Anthony Kline*, No. 5:15-CR-264-1BO (pled guilty to demanding, seeking, and receiving gratuities in violation of 18 U.S.C. § 201(c)(1)(B)).

22. The FBI and other agencies have been investigating bribery and corruption in connection with military war efforts overseas, including Afghanistan. The investigation has led to evidence of gratuities and bribes paid by Afghan contractors to United States public officials. The contractors include Afghan trucking companies subcontracted to fulfill TMRs who made payments to individuals working in the MCT or otherwise involved in managing or overseeing the TMR process.

23. The investigation revealed evidence of irregularities in the contracting process, as described in part above in Paragraph 14, to include circumvention of the competitive bidding process in order to award TMR subcontracts to a specific trucking company, and failure to submit TMRs for review and approval by military and civilian contracting offices other than the MCT, as required by government contracting regulations.

24. The investigation revealed that, from in or about 2009 to in or about 2012, certain Afghan trucking companies, including HSCC, received TMR transport subcontracts (as well as other contracts and subcontracts for services such as heavy equipment leases) despite charging rates above those offered by competitors.

6

## Involvement of Co-Conspirator Robert W. Green

25. Further investigation identified Robert Warren Green, an enlisted soldier in the United States Army based at Fort Bragg in the Eastern District of North Carolina. Green spent the majority of his military career working in the transportation and logistics fields. From in or about January 2008 to in or about April 2009, then-Staff Sergeant Green (Green has since been promoted to Sergeant First Class) deployed to Afghanistan with his unit, the 189th Combat Sustainment Support Battalion (189th CSSB), based at and deployed from Fort Bragg In Afghanistan, Green was assigned to the MCT at Kandahar Air Field.

26. While working at the MCT, Green received requests for resupply from United States units operating in southern Afghanistan, and Green created TMRs based on the requests he received. Green managed the subsequent TMR process, submitting TMRs to TOIFOR and monitoring TMRs through completion. Green frequently designated a specific Afghan trucking company on TMRs he created, and that usually resulted in the award of the TMR subcontract to the designated company.

27. Green pleaded guilty to a criminal information filed on April 8, 2015, charging him with a violation of Title 18, United States Code, Section 201(c)(1) (B)(demanding, seeking and receiving gratuities). *See United States v. Robert W. Green*, No. 5:14-CR-108-BO. Pursuant to a written plea agreement, Green provided the following information regarding his deployment to Afghanistan in 2008 to 2009:

    a. In or about January 2009, while standing outside the TOIFOR office on Kandahar Air Field, Green spoke to SHADMAN about cash payments that he thought SHADMAN had made to other soldiers, and Green asked whether he could also receive a payment from SHADMAN. SHADMAN initially agreed to pay Green $50,000.

7

b. Several days following this exchange, Green received a call from SHADMAN and SHADMAN instructed him to visit SHADMAN's private compound, located adjacent to Kandahar Air Field. When Green visited as instructed, SHADMAN pulled from his clothing a plastic bag containing $50,000, all in $100 bills. SHADMAN handed the bag to Green. Green stated that SHADMAN referred to the payment as a "bundle."

c. Green understood the payment of $50,000 was given to him as part of an agreement between him and SHADMAN and that according to the agreement, Green would award future TMRs to SHADMAN's company.

d. Between the time of the initial payment from SHADMAN to Green and Green's departure from Afghanistan in or about April 2009, Green processed multiple TMR subcontracts for which he designated SHADMAN's company, HSCC, as the contractor.

e. Green stated that, after the initial payment of $50,000 at SHADMAN's compound, SHADMAN gave Green several more payments. With each payment, SHADMAN followed the same process described above, calling Green and requesting a visit to the SHADMAN compound where Green received cash directly from SHADMAN. Each individual payment totaled between $30,000 and $50,000. Green stated that the final payment was made to him approximately three weeks prior to Green's return to the United States. Green and SHADMAN were always alone when SHADMAN handed him a payment or "bundle."

f. Green stated that he personally accepted a total of approximately $140,000 in cash, handed to him directly by SHADMAN in several installments between in or about January 2009 and in or about April 2009.

g. Green stated that he deposited $20,000 of the cash he received from SHADMAN into his personal bank account in the Eastern District of North Carolina upon his return to the United States in or about April 2009.

h. Following his return to the United States in or about April 2009 and in the Eastern District of North Carolina, Green used $25,000 of the cash paid to him by SHADMAN to purchase an automobile.

### Involvement of Co-conspirator David Anthony Kline

28. Further investigation identified David A. Kline as Green's superior officer during the 2008-2009 deployment to Afghanistan described above in Paragraphs 24 through 26. Kline was a United States Army First Lieutenant at the time, and in Afghanistan he served as the officer-in-charge of the MCT at Kandahar Air Field.

29. Working at the MCT, Kline oversaw the TMR process supporting United States military units operating in southern Afghanistan. In the course of his cooperation with the Government, Green described that, at Kline's request, Green spoke to SHADMAN who agreed to pay Kline $50,000. Green stated he accompanied Kline to SHADMAN's compound where he witnessed SHADMAN give to Kline a stack of cash which Green estimated to be approximately $50,000.

30. Kline pleaded guilty on November 5, 2015, to a criminal information filed on September 15, 2015, and charging him with a violation of Title 18, United States Code, Section 201(c)(1) (demanding, seeking and receiving gratuities). *See United States v. David A. Kline*, No. 5:54-CR-264-BO. Pursuant to a plea agreement, Kline provided the following information regarding his deployment to Afghanistan in 2008 to 2009:

a. Kline stated that during the course of the deployment to Afghanistan, in or about February 2009, Kline asked Green to arrange for SHADMAN to make a cash payment to Kline.

b. Kline stated that Green relayed his request to SHADMAN and then informed Kline that SHADMAN has agreed to pay Kline. Kline then visited SHADMAN's compound, accompanied by Green. While Green observed, SHADMAN handed to Kline a stack of $100 bills which amounted to approximately $50,000. Kline understood that the payment was given to him by SHADMAN with the expectation that Kline would use his position as officer-in-charge of the MCT to treat SHADMAN's companies favorably in the contracting process and, in particular, to award future TMRs to SHADMAN's companies.

c. Kline stated that he brought the cash that SHADMAN had given to him out of Afghanistan when he returned to the United States, and that he subsequently spent the money on various expenditures.

## CONCLUSION

31. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 371 (Conspiracy), and Section 201(c)(1)(A) (Giving, Offering, and Promising a Gratuity to a Public Official) have been committed by HIKMATULLAH SHADMAN. Accordingly, a warrant to arrest HIKMATULLAH SHADMAN is requested.

Special Agent Timothy G. Gannon
Federal Bureau of Investigation

Subscribed and sworn to before me on the 23 day of December, 2015

Honorable Robert T. Numbers, II
United States Magistrate Judge

Seen and approved by:
AUSA BR
DOJ –Criminal Fraud LWW